STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JOSEPH GRILLO, DEFENDANT-APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. SILVIO DE VITA AND JOSEPH GRILLO, DEFENDANTS-APPELLANTS AND RALPH ROSANIA, DEFENDANT.

Argued November 3, 1952—Decided December 15, 1952.

*Mr. George R. Sommer* argued the cause for the appellant Joseph Grillo.

*Mr. Edward R. McGlynn* argued the cause for the appellant Silvio De Vita (*Mr. Joseph Weintraub,* of counsel, *Mr. Brendan T. Byrne,* on the brief).

*Mr. Edward Gaulkin,* Essex County Prosecutor, argued the cause for the respondent (*Mr. C. William Caruso,* of counsel and on the brief).

The opinion of the court was delivered by

BURLING, J. The appeals before us are brought by two defendants, each of whom was convicted by a jury of murder

in the first degree and sentenced to death. The defendants-appellants, Silvio De Vita and Joseph Grillo, together with one Ralph Rosania, were indicted for murder and subsequently were brought to trial together in the Essex County Court, Law Division. The theory of the State's case was that the defendants' crime was elevated to first degree murder under *R. S.* 2:138–2 (substantially reenacted in *N. J. S.* 2*A*:113–2), the killing having occurred during the course of a robbery. The jury brought in verdicts of guilty of murder in the first degree against each of the three defendants, and recommended life imprisonment as to Rosania. All were sentenced, Grillo and De Vita having imposed on them the death sentence. Grillo and De Vita have filed and argued concurrently separate appeals to this court from their respective judgments of conviction, but inasmuch as the major portion of the questions involved are identical we shall dispose of both appeals in this single opinion. Rosania did not appeal.

The facts surrounding the commission of the killing from which the prosecutions emanated appear to be uncontroverted. On the night of Friday, November 9, 1951, Thomas Lofrano the manager of a large food market in Newark, collected the receipts from the various departments of the market in a canvas deposit receptacle, locked it, and placed it in a brown paper bag. The sums thus contained were $5,161.21 in cash and $476.60 in checks. He and James Law, a uniformed special officer, then left the market and entered Law's automobile, parked on the busy street on which the store fronted, for the purpose of taking the collected receipts to a bank for deposit. As Law was about to start the car, the door on Lofrano's side was opened, and De Vita, who was standing close to the side of the car, pointing a gun across Lofrano's stomach, said: "It's a stickup." Grillo, also armed, opened the door on Law's side. Law raised his hands, there was a shot, Law slumped over the wheel and Grillo reached into the car and took the bag containing the day's receipts.

Both robbers escaped. Law died about two hours later in the hospital, without regaining consciousness. An investi-

gation by the Newark police and the Essex County Prosecutor's office ensued, directed to the solution not only of the Law killing but of other then unsolved robberies in the area.

On November 13, 1951, at about 4:30 A. M., detectives who had been watching for Grillo, who was under suspicion as a result of information obtained by the police, sought to apprehend him as he entered his home. He fled into the house, jumped from an upstairs porch into a neighbor's yard and was overtaken as he attempted to vault a fence. When he was taken to police headquarters it was discovered that his legs had been injured in the jump, and he was taken to a hospital for treatment (about 8 A. M.). At 1:00 P. M. on the same day he was returned to police headquarters for questioning. At about the same time De Vita was apprehended elsewhere by detectives and taken to police headquarters. The police investigation also resulted in the arrest about 3:35 P. M. of Rosania, a former employee of the market whose property was the subject of the robbery during which Law was killed.

In the late afternoon of November 15, 1951 Rosania admitted his part in the robbery in which Law was killed and detailed to a police sergeant the planning of the robbery with Grillo and De Vita over a period of more than a month prior to the crime. On the basis of this information De Vita and Grillo were again questioned, and each admitted his participation in the robbery and the killing of Law. More evidence consisting of bags containing money was located by police where it had been hidden behind ceiling rafters in Grillo's home. Grillo was confronted with this evidence during his interrogation.

Following the oral admissions of the three suspects, on the night of the 15th of November, written statements were separately made by all three. The written statements were completed after midnight and all three of these defendants were brought together; each statement was read to them, and each (except Rosania—who requested an assistant prosecutor to read his aloud for him) read his own statement in the

presence of the others. The statements contained details of the defendants' past association, planning and preparation for the robbery, perpetration thereof, and the facts subsequent thereto relevant to distribution of the spoils. All three were arraigned on a murder complaint (filed at about 11:00 P. M. on November 15) on the morning of November 16, 1951.

On November 17, 1951 Grillo pointed out the approximate location in the Passaic River where he admitted he threw the murder weapon. It was recovered by the police on that day.

At their subsequent trial on the murder charge (after indictment) the defendants took the stand in their own behalf. Their testimony in substance verified their oral and written statements above mentioned. Grillo and De Vita contended that the actual shooting of Law was unintentional and accidental; Grillo, that the gun "went off" as he tried to cock it.

As hereinbefore recited, the trial resulted in the conviction of all three defendants of first degree murder, and Grillo and De Vita appealed to this court.

The questions involved include: (a) admissibility of the confessions of Grillo and De Vita and validity of the trial court's instructions to the jury relevant to the confessions: (b) admissibility of evidence; (c) whether there was error in various portions of the trial court's charge to the jury (hereinafter detailed); and (d) whether the prosecutor's remarks to the jury in his opening and summation were prejudicial to the rights of the defendants. Neither defendant asserts that his conviction was against the weight of the evidence.

### The Confessions

The first question involved herein is whether the Grillo and De Vita confessions were properly admitted in evidence, i. e., whether they were voluntary.

Grillo's present contention is that his confessions and admissions were not voluntary because he was questioned "almost continuously" by the police and was denied adequate rest,

food and care and was denied permission to communicate with family and counsel. De Vita makes substantially similar contentions. Neither alleged that there was any physical force, threat or promise made to induce his confession and both testified that no such abuses existed in this case.

Grillo's testimony was corroborative of that of police officers and other witnesses as to hospital care and other attention given him for his injured legs, including the provision of a wheel chair for his convenience. Both Grillo's and De Vita's testimony as to the sufficiency of food was vague and conflicting; and their testimony as to adequacy of rest was conflicting and negatived their allegations of incessant questioning. The remaining pertinent witnesses also negate their allegations. The answers given by both of these defendants to leading questions respecting denial of permission to communicate with their families, friends and counsel were perfunctory. In these respects the other pertinent witnesses testified that there were no requests and consequently no denial of communication.

The legal questions here involved as to admissibility, and the voluntary character, of confessions and admissions, including effect of allegations of delay in arraignment, alleged denial of adequate rest, food and care, alleged denial of communication with family and friends, are substantially the same as those raised in the recent case of *State v. Cooper,* 10 *N. J.* 532 (1952). The applicable principles of law relating to such questions have been fully discussed and marshalled in Mr. Justice Wachenfeld's opinion in said case.

With respect to the allegations of denial of permission to consult counsel during the police interrogation, the former Court of Errors and Appeals has expressly determined this alleged constitutional question, denial of counsel during the period between arrest and arraignment and its effect on a confession obtained during that period, adversely to the contentions here presented by the defendants, in *State v. Murphy,* 87 *N. J. L.* 515, 528–531 (*E. & A.* 1915). In *State v. Murphy, supra,* the court said:

"The constitutional provision, whose protection is invoked, contemplates a criminal prosecution and provides for a speedy and public trial by an impartial jury, that the accused shall be informed of the nature and cause of the accusation, be confronted with the witnesses against him, have compulsory process for obtaining witnesses in his favor, and (conjunctively) have the assistance of counsel for his defense. It clearly appears that the rights thus intended to be secured to a criminal defendant are rights arising from a criminal prosecution—that is, a trial upon an indictment. A prisoner making a confession is not confronted with any witnesses, at least never in the sense that they are examined in his presence, he can have no process for witnesses in his favor upon such an occasion, and, consequently, he is not entitled to the assistance of counsel to save him from himself. That is done later by the trial court if the confession were unlawfully obtained." (87 *N. J. L.* at *pages* 530–531).

It was held in *State v. Bunk,* 4 *N. J.* 461, 470 (1950), *certiorari* denied 340 *U. S.* 839, 71 *S. Ct.* 25, 95 *L. Ed.* 615 (1950) that:

"* * * the law over the years in this State has been that a person is only entitled to counsel to aid him in his defense, not to save him from his own voluntary acts, *State v. Murphy,* 87 *N. J. L.* 515 (*E. & A.* 1915) ; *State v. Cole,* [136 *N. J. L.* 606], *supra,* * * *."

The ultimate test still remains—was the confession voluntarily made?

We find no error in the allegations of denial of due process, leveled at the confessions of the defendants and their introduction in evidence in this case was proper. The record shows marked spontaneity of attitude of the defendants to disclose the information in the confessions, as expressions of free choice and not the product of physical or mental ordeal or compulsion. There was no fundamental unfairness in the use of the evidence.

Further, it has been held in *State v. Cooper, supra*:

"Whether a statement or confession is, in fact voluntary, depends on the facts of the individual case and the determination of the trial court will not be disturbed on appeal where the evidence is adequate to sustain it. *State v. Cole, supra; State v. Pierce, supra* [4 *N. J.* 252]."

On the question of the trial court's instructions to the jury relative to the use of the confessions in their deliberations, there was no reversible error. In this respect the charge was in accord with the law of. this State as settled in *State v. Compo*, 108 *N. J. L.* 499, 502–504 (*E. & A.* 1932).

### EVIDENCE

The next questions involved have as their focal point the admissibility of evidence.

Defendants Grillo and De Vita both contend that three categories of evidence were improperly admitted, namely: (a) evidence indicating commissions of other offenses and criminal associations; (b) a gun, masks and paraphernalia of crime; and (c) events occurring after the event, suggesting sexual immorality. We find no error in the action of the court.

On the matter of the class of evidence such as the weapon, masks and other accoutrements of crime which were introduced and proved to have been in the possession, under the control of, or owned by the defendants, there was no error. In *State v. Hill*, 65 *N. J. L.* 626, 632 (*E. & A.* 1900), it was held similar evidence was admissible where it would "in anywise show" the defendant's "state of mind and intent." An example of these principles concerned masks that were found in defendants' possession by police officers two months prior to a highway robbery. These were admitted at the trial of those defendants for the highway robbery, and this was held "no error justifying a reversal" in *State v. Unger*, 103 *N. J. L.* 18, 23 (*Sup. Ct.* 1926), affirmed 104 *N. J. L.* 448 (*E. & A.* 1928). In *State v. Cerciello*, 86 *N. J. L.* 309, 312 (*E. & A.* 1914), the former Court of Errors and Appeals stated:

"The connection between the revolver and the whiskey bottle and the defendant's criminal attitude regarding the deceased, and his preparation for the commission of the deed were thus sufficiently evinced and connected as to make it apparent that both the articles

were properly admitted in evidence as bearing upon the defendant's state of mind and the truth of his admissions."

In *State v. De Paola*, 5 *N. J.* 1, 12 (1950), it was held:

"* * * where there is a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other; evidence thereof is admissible, and such evidence does not fall under the condemnation of testimony relative to other offenses than the one for which the defendant is on trial."

The incidental disclosure of other offenses and criminal associations which were brought to light by the introduction of the evidence of which the defendants complain, under the circumstances of this case, was not error.

The evidence of matters subsequent to the robbery-killing was admissible to prove the distribution of spoils of the robbery. *United States v. Jackskion*, 102 *F.* 2d 683, 123 *A. L. R.* 116 (2 *Cir.*, 1939), *certiorari* denied 307 *U. S.* 635, 59 *S. Ct.* 1032, 83 *L. Ed.* 1517 (1939); 2 *Wharton's Criminal Evidence* (11th ed. 1935), sec. 746, *p.* 1258; 2 Alexander, *The Law of Arrest* (1949), sec. 385, *pp.* 1215–1217; 22 *C. J. S., Criminal Law*, § 636, *p.* 974. And the fact that the evidence incidentally disclosed immoral activity does not require its exclusion.

## PROSECUTOR'S REMARKS

It is asserted in the questions involved that the defendants' rights were prejudiced by the comments of the prosecutor.

Both Grillo and De Vita urge as a ground for reversal the allegedly inflammatory remarks of the prosecutor, expressed in the opening, the summation and during the course of the trial. The State observes that there was no application made for a mistrial or request to the trial court to instruct the jury to disregard the statements.

The remarks were to the effect that these defendants were members of an organized criminal group and that the statute providing for recommendation of life imprisonment was not intended to apply to defendants such as these defendants.

The *Canons of Professional Ethics* restate a legal theorem that the primary duty of a lawyer engaged in public prosecution is not to convict but to see that justice is done (*Canon 5*). However, the prosecutor was charged by statute as follows:

"Each prosecutor of the pleas shall be vested with the same powers and subject to the same penalties, within his county, as the attorney general shall by law be vested with or subject to, and *he shall use all reasonable and lawful diligence for the detection, arrest, indictment and conviction of offenders against the laws.*" (Emphasis supplied.) *R. S.* 2:182–5 (see also *L.* 1948, *c.* 54, *p.* 141, *sec.* 1, *N. J. S. A.* 2:182A–1). Compare *N. J. S.* 2A:158–5.

It was his duty to prosecute with earnestness and vigor circumscribed with the obligation to refrain from improper methods. Though the statements were strong and forceful and the language used in referring to legislative intent was crude, the prosecutor confined himself to the evidence. Viewed in the light of the charge of the trial court they do not constitute ground for reversal. *Cf. State v. Tansimore,* 3 *N. J.* 516, 534–536 (1950); *State v. Continental Purchasing Co., Inc.,* 119 *N. J. L.* 257, 263 (*Sup. Ct.* 1938), affirmed 121 *N. J. L.* 76 (*E. & A.* 1938); *State v. Hauptmann,* 115 *N. J. L.* 412, 416–417 (*E. & A.* 1935), *certiorari* denied 296 *U. S.* 649, 56 *S. Ct.* 310, 80 *L. Ed.* 461 (1935).

### CHARGE OF THE COURT

 (1) A further question involved is grounded in the trial court's failure to charge the jury that intent is an element of robbery. Defendant De Vita contends that the trial court erred in refusing to instruct the jury with De Vita's 41st request to charge, which reads as follows:

"41. If the evidence or lack of it leaves a reasonable doubt in your minds that Silvio De Vita had the criminal intent to commit robbery, then he is not responsible for the ensuing death of James Law and you must acquit him."

De Vita argues that intent to commit robbery is an essential element of this case and therefore the refusal to charge his 41st request constituted prejudicial error. The State admits that felonious intent is an essential element of the crime of robbery but argues that it was not necessary to instruct the jury in the language requested by De Vita.

It is axiomatic that the trial court need not charge in the exact language requested, and that the defendant has no right to choose the language in which the court should state the pertinent instructions, provided the subject matter of the request has been fully and correctly covered. *State v. Ellrich,* 10 *N. J.* 146, 154 (1952). Upon this settled principle alone the denial of De Vita's request No. 41 was proper. In addition to the fact that the language of the request failed to confine the intent to the robbery alleged in this case, the trial court's instructions fully covered the subject matter. The court charged:

"In this case the state contends that all three defendants aided and abetted in the robbery perpetrated upon James Law. The state further contends that during the perpetration of the robbery, James Law was shot and killed by the defendant Grillo. That contention of course raises the question of the criminal responsibility of the defendants De Vita and Rosania if you find beyond a reasonable doubt that they, or either of them aided or abetted the robbery."

and further charged:

"* * * it makes no difference that De Vita did not fire the shot that killed James Law, nor that Ralph Rosania was not at the scene of the actual killing if you find beyond a reasonable doubt that either or both of them as the case may be, aided and abetted in the planning of the robbery. * * *"

In *State v. Turco,* 99 *N. J. L.* 96, 102–103 (*E. & A.* 1923) the former Court of Errors and Appeals stated:

> "The trial judge charged the jury that the effect of the statute which provides that if, in an attempt to commit robbery, one man, or any number of men, kill another, even though they did not start with that purpose in mind, but with the single purpose of robbery, their act, in such circumstances, * * * is denominated murder. This was correct, * * *"

The same elements are present, though couched in different langauge in the present case.

We fail to perceive how there could be any possible confusion in the jury's mind as to their duty to find beyond a reasonable doubt that the defendant De Vita had a criminal intent to commit the robbery alleged. We find no error in the trial court's charge in this respect nor in its refusal to repeat the instructions in the specific language of the De Vita request.

And there seems to have been no claim on De Vita's behalf that he did not intend to commit the robbery, for his counsel, in his remarks in summation to the jury stated:

> "The first part of your verdict, as far as I am concerned, you do not have to take much time about. * * * It would be an insult to your intelligence, and it would be ridiculous on my part, so far as my client is concerned, to even suggest that he should be acquitted."

In view of the foregoing it is difficult to comprehend in what respect the trial court's failure to charge as requested, if it had been error, could have been deemed prejudicial to the rights of this defendant.

There is persuasive authority that the action of the trial court was not error. In the case of *State v. Boccadoro,* 105 *N. J. L.* 352, 358 (*E. & A.* 1929), the trial court instructed the jury that the uncontroverted facts proved in the case showed that the decedent came to his death as the result of a bullet fired into his body by a person who had forced his way into the decedent's house in an attempt to commit burglary, and then charged: "Now, gentlemen, the question which you must decide in this case is simply this: Did Boccadoro kill Thompson?" The former Court of Errors and Appeals,

affirming Boccadoro's conviction, held (105 *N. J. L.* at *page* 358):

"Taking the two statements, together, the law upon this question was correctly expounded to the jury, the meaning of the instruction being that, as it was practically conceded that the killing was done by a man attempting to commit a burglary, the only question left for determination was whether the defendant was or was not that man."

Further in *State v. Lyons,* 70 *N. J. L.* 635, 645 (*E. & A.* 1904), it was held that a proper definition of the crime of robbery in a murder trial based on that theory was:

"Robbery is stealing property with violence from the person or personal custody of another person. It is necessary, in order to constitute that crime, that the goods shall be on the person of the owner, or the owner's agent, or shall be in his presence and in his custody."

The trial court in the present case charged the jury in similar language. Compare the statutory definition contained in *R. S.* 2:166–1 and *N. J. S.* 2A:141–1. The former Court of Errors and Appeals approved the charge in the *Lyons* case, quoted *supra,* as applicable to either the statutory or common law crime of robbery in a felony-murder case, in *State v. Compo, supra* (108 *N. J. L.,* at *pages* 500–501). In this respect the *Compo* case was later expressly followed by the same court in *State v. Jones,* 115 *N. J. L.* 257, 263–264 (*E. & A.* 1935). *Cf. State v. Mule,* 114 *N. J. L.* 384, 390, 396 (*E. & A.* 1935).

It has even been held that where commission of robbery is an undisputed fact it is unnecessary to instruct the jury to find the specific intent to commit the crime. See *State v. Casuso,* 6 *N. J. Misc.* 112, 114 (*Sup. Ct.* 1928), affirmed *sub nom. State v. Legenza,* 106 *N. J. L.* 600 (*E. & A.* 1929). *Cf.* 77 *C. J. S., Robbery,* § 49 *b*(7), *pp.* 514–515.

(2) Defendant Grillo contends that the trial court erred in refusing to charge the text of the statute relative to the acceptance and effect of a plea of *non vult.*

The record shows that at the close of the trial, after all the parties had rested but in the absence of the jury, counsel for Grillo informed the trial court that prior to trial the prosecutor told him he would seek the death penalty and would not recommend acceptance of a plea to the indictment; counsel for Grillo and De Vita sought leave of the court to withdraw the previous plea of not guilty and to enter a plea of *non vult*. The State opposed these motions, and the trial court, exercising its statutory discretion, denied them and declined to accept the plea. The only references to this procedure before the jury were made by counsel for Grillo and De Vita in their respective summations, during the course of which both counsel practically conceded their respective clients' guilt of offense charged.

To have charged as requested by Grillo might well have been adverse to the defendants, for the jury might have unjustifiably inferred from the requested instruction that where the court had refused the acceptance of the plea the jury should not make a recommendation of life imprisonment. We find no error in the trial court's refusal to instruct the jury as requested in this respect.

(3) Among these questions on the charge is the assertion, made on behalf of each of the appealing defendants, that the trial court erred in restricting the jury, as to each defendant, to one of two verdicts: guilty of murder in the first degree (with or without recommendation), or acquittal. The defendants argue that the trial court erred in failing to charge on second degree murder. As the State contends, neither Grillo nor De Vita submitted a request to charge in this respect, nor pointed out to the trial court their objections to this alleged error. *Rule* 2:7–8(*b*). But it is unnecessary to rest our determination upon the technical requirements of the rules. The precise question has been determined adversely to these defendants' contentions in *State v. Bunk,* 4 *N. J.* 461, 474, 475 (1950), *certiorari* denied 340 *U. S.* 839, 71 *S. Ct.* 25, 95 *L. Ed.* 615 (1950). And it is firmly settled in our law that such a charge, directing the

jury to bring in a verdict either of guilty of murder in the first degree or of acquittal is not error under circumstances such as exist in this case. See, for example, *State v. Young*, 67 *N. J. L.* 223 (*E. & A.* 1902); *State v. Palmieri*, 93 *N. J. L.* 195 (*E. & A.* 1919); *State v. Martin*, 94 *N. J. L.* 139 (*E. & A.* 1920); *State v. James*, 96 *N. J. L.* 132 (*E. & A.* 1921); *State v. Carlino*, 98 *N. J. L.* 48 (*Sup. Ct.* 1922), affirmed 99 *N. J. L.* 292 (*E. & A.* 1923).

(4) Another portion of the charge to which our attention is directed dealt with the subject of recommendation of life imprisonment. This subject was covered at length by the trial court. His remarks conclude with two sentences to which both Grillo and De Vita object, namely:

"* * * If that condition does arise, the penalty is death, determined not by the jury but by the statute and pronounced by the court. It is not correct to say that the jury imposes the sentence of death where it does not choose to make the recommendation for life imprisonment."

These defendants admit that they raised no objection to this language (see *Rule* 2:7–8(*b*), *supra*) but contend that it constitutes an obvious error on the face of the record and therefore is reviewable under *Rule* 1:2–19(*a*). It is the function of the jury to adjudge the degree of guilt and for the court to pronounce the sentence. The court properly advised the jury as to its obligation and duty after having arrived at the degree of guilt then to determine, upon and after the consideration of all the evidence, whether to mitigate the death sentence. The form of verdict to pronounce that judgment was accurately explained. The phrases charged here have been expressed as the law of this State, *State v. Bunk*, *supra*, (4 *N. J.*, at *page* 475); *State v. Cordasco*, 2 *N. J.* 189, 201, 202 (1949). In the *Cordasco* case, *supra*, it was indicated that a charge in such language would have been proper.

In the present case the trial jury obviously was not misled by the quoted instruction for it made the recommendation as to Rosania, the third defendant, who has not appealed. Under

all the circumstances and the charge as a whole, we are of the opinion that no error prejudicial to the substantial rights of either of the defendants was committed by the trial court in this connection.

(5) Defendant De Vita argues for reversal upon the further ground that the trial court erred in refusing to charge his request No. 49 as to the right of jurors to change their vote at any time. The trial court had instructed the jury in this respect in its general charge and, we find, sufficiently so. It is not necessary that the instruction be couched in terms requested where the law has been correctly charged in other language. *State v. Ellrich, supra.*

### CONCLUSION

On the trial of this case the defendants suffered no manifest wrong or injury in the admission or rejection of evidence, in the charge of the court, or in any matter touching the conduct of the trial and no error intervened which prejudiced either defendant in maintaining his defense upon the merits.

For the reasons expressed in this opinion the judgments below are affirmed.

HEHER, J. (dissenting). I do not concur in the view that the trial judge in substance charged the jury that "a criminal intent to commit robbery" was an essential ingredient of the statutory offense of murder in the first degree laid to the accused in the indictment, and so the request for an instruction in this regard interposed by the defendant De Vita was properly refused as unnecessary, and that, at all events, the question of intent was not at issue, for there was "no claim on De Vita's behalf" in the opening statement to the jury made by his counsel "that he did not intend to commit the robbery."

The judge instructed the jury that "the statute makes no mention of the element of the intention to kill in connection

with a killing which shall be committed in perpetrating a robbery," and in cases "where death ensues from the commission of a robbery, the commission of the robbery is regarded as standing in the place of, or as the legal equivalent of, the wilfulness, deliberation, and premeditation required under the statute, and therefore the State is not under a duty to prove wilfulness, deliberation, and premeditation where it has proved that a killing has been committed during the perpetration of a robbery." But there was no reference whatever to the indispensable requisite of an intent to commit the basic crime of robbery and of De Vita's participation in that intent, if the offense was to constitute murder in the first degree.

The State differentiates in this regard between proof of a robbery as the substantive offense charged .and murder in the commission of a robbery. Conceding that in the former case "felonious intent" is an element of robbery to be proved, the insistence is nevertheless that in the latter case proof of "wilful intent to kill, deliberation and premeditation is dispensed with, and in its place is substituted the proof of the *commission of the robbery.*" (Italics the State's.) I do not perceive the distinction. Where it is charged that the killing was done in the perpetration or attempted perpetration of one of the enumerated statutory felonies, proof of an intent to kill, deliberated and premediated, is of course unnecessary; but, by the same token, it is requisite that there be proof of an intent to commit the underlying statutory offense.

The State had the burden of proof of all the essential elements of murder in the first degree; and, while a murder committed in the perpetration or attempted perpetration of a robbery is murder in the first degree under the statute, irrespective of the intent and mental operations otherwise essential to an offense of that degree, proof of the "commission of the robbery" *ex, necessitate* involves the felonious intent which is a constituent of that offense. It would seem to be axiomatical truth that there cannot be a conviction of mur-

der in the first degree for a killing in the perpetration or attempted perpetration of an offense of the statutory class, unless all the elements of the basic crime be established as on the trial of an indictment for that offense alone.

I shall not consider whether in the particular circumstances the ruling was prejudicial. There are other grounds for reversal, common to both of the accused, which I deem to be well founded.

The trial judge charged the jury that, if there be no recommendation of life imprisonment, "the penalty is death, determined not by the jury, but by the statute and pronounced by the court. It is not correct to say that the jury imposes the sentence of death where it does not choose to make the recommendation for life imprisonment."

This suggests that the jury is under no duty affirmatively to determine which of the alternative punishments, death or life imprisonment, shall be inflicted, and thereby unduly modifies the jury's responsibility in this behalf under the rule of *R. S.* 2:138–4, now superseded by *N. J. S. 2A*:113–4.

There is laid upon the jury the duty "to determine, within the limits fixed by the statute, what" the accused's "punishment shall be." *State v. Rombolo,* 89 *N. J. L.* 565 (*E. & A.* 1916). The jury are made the final arbiters of the punishment; that tribunal exercises judgment and discretion based on the evidence. The choice is the jury's; but a choice there must be. *State v. Cooper,* 2 *N. J.* 540 (1949). I reiterate the views expressed in my dissenting opinion in *State v. Bunk,* 4 *N. J.* 461 (1950).

And, on the crucial issue of whether the judgment should be death or life imprisonment, the trial prosecutor in his closing argument transgressed the substantial rights of the accused under the statute. He said:

"As I recall the law, being a former member of the legislature, the punishment originally for first degree murder was death. At that time or many years later, there was an agitation that death should not be the punishment in every case. Then the legislature in its wisdom said: We will give the right to a jury, if they so feel upon

and after a consideration of all the evidence, to recommend life imprisonment. This is not the type of case the legislature had in mind when it gave jurors the right upon and after a consideration of all the evidence to attach to their verdict of guilty of murder in the first degree a recommendation of life imprisonment.

This is the type of case that the Legislature had in mind when it said that persons convicted of first degree murder shall suffer death. If you don't think so, thumb your nose at the Legislature. I don't care. But if you believe in law and order, you will return a verdict of guilty of murder in the first degree against each and every defendant on trial."

This served to deny the accused the essence of a fair trial of the issue of life or death as the punishment for the crime of which they were convicted, such as was within legislative contemplation. Thereby, the prosecutor drew upon his experience as a legislator for a legislative intention that is not to be found in the enactment itself. He declared that the instant case was not within the class the Legislature had in view; *e contra,* that the Legislature had death "in mind" for cases of this type, and "If you don't think so, thumb your nose at the Legislature." It was the natural tendency of this argument, ill-founded in law and in fact as it was, to coerce the jury into prescribing death as the punishment supposedly to conform to the legislative intention and thus to avoid public opprobrium for not doing so.

There was fundamental unfairness in this assessment of the jury's statutory function to resolve the issue of punishment, such as in all human likelihood operated to deprive the accused of the essential benefit of the statutory rule. The accused is entitled to a fair trial and to the ungrudging application of the statutory policy for determining the punishment. In the words of Cardozo, C. J.: "A criminal, however shocking his crime, is not to answer for it with forfeiture of life or liberty till tried and convicted in conformity with law." *People v. Moran,* 246 N. Y. 100, 158 N. E. 35, 37 (*Ct. App.* 1927). There is all the more reason for fairness where the issue is that of life or death.

I would reverse the judgment and direct a new trial of the issue.

194 

*For affirmance*—Chief Justice VANDERBILT, and Justices OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN —6.

*For reversal*—Justice HEHER—1.